**Daniel E. REMPA, Carolyn R. Rempa, Daniel J. Rempa and Stephanie M. Rempa, Defendants-Appellants,**

v.

**LaPORTE PRODUCTION CREDIT ASSOCIATION, Plaintiff-Appellee.**

**No. 3–182A9.**

Court of Appeals of Indiana, Third District.

Jan. 19, 1983.
Rehearing Denied March 25, 1983.

Gordon A. Etzler, Richard A. Browne, Hoeppner, Wagner & Evans, Valparaiso, for defendants-appellants.

Richard F. Joyce, Kizer, Neu, Joyce, Hite, Wyland, Wagner & Gifford, Plymouth, for plaintiff-appellee.

GARRARD, Judge.

Daniel E. Rempa (Daniel) had been employed by a partnership engaged in the concrete pouring and finishing business. When that partnership was dissolved Daniel had the opportunity to form a new partnership with one of the former partners. In search of a loan to provide his contribution to such a partnership, Daniel conferred with the LaPorte Production Credit Association (PCA). Daniel was not eligible for a PCA loan since he was not engaged in farming, but the PCA loan officer suggested that he might discuss the matter with his parents, Daniel J. and Stephanie Rempa. The senior Rempas were farmers and had previously taken PCA loans to finance their farming operations.

On November 2, 1976 Daniel and his mother went to the PCA to pursue a loan for Daniel's benefit. They discussed a $20,000 loan to provide the funds for Daniel to buy into the concrete business. A loan application in the names of Daniel, his wife and both his parents was filled out and signed by Daniel and his mother. A demand note was also made out, and the Rempas left with the note, a security agreement and a financing statement, all of which required the additional signatures of Daniel's wife and his father. On November 4th the mother returned the signed documents to PCA and Daniel received the loan proceeds.

In 1979 Daniel's concrete business failed and the partnership was dissolved. The PCA loan was not repaid, and in April 1980 PCA commenced suit against all four Rempas for the $18,564.98 remaining unpaid together with attorneys' fees. Rempas answered and as an affirmative defense asserted that PCA had promised to perfect a security interest in construction equipment purchased with the loan proceeds; that PCA had failed to perfect this interest; and that therefore PCA should be precluded from recovering against the Rempas. Rempas also asserted a counterclaim against PCA for actual and punitive damages alleging PCA's failure to perfect a security interest in the partnership's equipment and its harassment of Rempas attempting to secure payment.

Before trial the parties stipulated the unpaid loan balance, a reasonable attorney fee and that the senior Rempas had signed the promissory note sued upon as accommodation makers. Daniel and his wife failed to appear at trial and judgment was taken against them. Trial by jury against the senior Rempas resulted in a judgment on the evidence in favor of PCA at the conclusion of all the evidence. In its order denying Rempas' subsequent motion to correct errors, the trial court noted (1) that no claim of fraud or mistake was within the

issues raised by the pleadings and there had been no motion to amend the pleadings to conform to the evidence; (2) that the evidence concerning the agreement of PCA to take a security agreement in the construction equipment would constitute a violation of the parol evidence rule and, thus, could not alter the terms of the instruments sued upon; and (3) that even if the jury could consider the parol agreement there was such a failure of proof as to the ownership of the equipment and of values that any attempt by the jury to assess the extent to which Rempas were injured by PCA's failure to perfect a security interest would be complete speculation.

On appeal Rempas contend, essentially, that the judgment was contrary to law. They also argue the court erred in refusing to admit into evidence a letter written by Daniel Rempa.

■ In reviewing a grant of judgment on the evidence against the party bearing the burden of proof at trial, it is well settled that the judgment was properly granted only if there is no substantial evidence or reasonable inference derived therefrom supporting some essential element of the claim. Thus, our review looks to the evidence most favorable to the party opposing the motion. *Vernon Fire & Casualty Ins. Co. v. Sharp* (1976), 264 Ind. 599, 349 N.E.2d 173.

Bearing this in mind we turn to the evidence produced at trial. Rempas testified that they had not consented to a lien on their property in connection with the loan to Daniel. To the contrary, they explicitly instructed PCA to secure the loan with Daniel's assets.

The senior Mrs. Rempa testified that during the initial discussion Mr. Schmidt, PCA's vice-president, agreed to take a security interest in the construction equipment to be purchased by Daniel after she emphasized that she and her husband did not want another lien upon their crops and farm equipment.[1] She testified that when she signed the loan application only Daniel's

---

1. The Rempas' crops and farm equipment were collateral under a security agreement with PCA executed by them in March 1976.

vehicles and cash were listed and the rest of the document was blank. She stated that the financing statement and the security agreement for the loan were blank when she took them home for her husband's signature. The signed blank documents, along with the fully executed note, were then returned to PCA. Mrs. Rempa further testified that she told Mr. Schmidt and Mr. Bowmar, another PCA employee, on the day she and Daniel picked up the check that they did not want a lien on their farm equipment and they replied, "Yeah, yeah, yeah."

In early 1977 the senior Mrs. Rempa was concerned that Daniel's business would fail and had a telephone conversation with Mr. Bowmar. According to her Bowmar stated PCA had a lien on the construction equipment. She also testified that in March 1977 Mr. Schmidt told her "If anything goes wrong we are the first ones that are going to come in on this construction equipment, then it is going to be Danny's car and truck and then if that isn't enough then we are going to come after you."

On the other hand, the loan application as it appears in the record included the value of the senior Rempas' assets, listing the value of their real estate, farm equipment and crops. Daniel's pickup truck, automobile and $5,000 cash were also listed. The security agreement introduced at trial and signed by all four Rempas listed numerous items of farm equipment.

Considering the facts most favorable to Rempas, either by inadvertence or design, blank signed documents were completed contrary to the express request of Daniel and his mother. Rempas argue they should be discharged from their accommodation contract because PCA breached its agreement by failing to take a security interest in the construction equipment *and* by filling in the blank forms contrary to the agreement of the parties. PCA argues that the terms of the transaction are conclusively manifested by the note and security agree-

ment and that they may not be altered by parol evidence.

Initially, we agree that the parol evidence rule is a rule of substantive law. Thus, if extrinsic evidence was not capable of varying the terms of the agreement, then even though the evidence was in fact admitted, both the trial and this court should disregard it. *Seastrom Inc. v. Amick Const. Co.* (1974), 161 Ind.App. 309, 315 N.E.2d 431.[2] We recently applied the rule where a party sought to vary by parol evidence the terms of a production credit association loan secured by a mortgage on real estate. *Creech v. LaPorte Production Credit Ass'n.* (1981), Ind.App., 419 N.E.2d 1008.

We must, however, distinguish *Creech* from the present case because the security agreement herein applies to personal property and is governed by Article 9 of the Uniform Commercial Code. IC 26–1–9–101 et seq.

IC 26–1–9–105(1)(h) defines a security agreement as "an agreement which creates or provides for a security interest." The term "agreement" is also defined by the code. An agreement is "the bargain of the parties *in fact* as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in the Act (sections 1–205 and 2–208)." (Emphasis added) IC 26–1–1–201(3). In addition IC 26–1–1–201(11) defines "contract" as "the total legal obligation which results from the parties' agreement as affected by the Act and any other applicable rules of law."

A security agreement is therefore simply the visage of the underlying contract between the debtor and the creditor. As the authors state in WHITE & SUMMERS, UNIFORM COMMERCIAL CODE (2ND ED.) pp. 904, 905:

> "Section 9–203 requires a 'security agreement,' a term defined in 9–105 as 'an agreement which creates or provides

---

2. If the parol evidence rule applies, then the court quite properly disregards the evidence it prohibits when the court rules on a motion pursuant to Indiana Rules of Procedure, Trial Rule 50.

for a security interest.' The conjunction of 9–203 and 9–105 calls for two independent inquiries. The *court* must first resolve, *as a question of law,* whether the language embodied in the writing objectively indicates that the parties may have intended to create or provide for a security interest. If the language crosses this objective threshold, that is, if the *writing* evidences a possible secured transaction and thus satisfies the statute of frauds requirement, then the *factfinder* must inquire whether the parties actually intended to create a security interest. Parol evidence is admissible to inform the latter, but not the former, inquiry." (Emphasis in original)

Moreover, security agreements represent consensual liens created by agreement of the parties. The fundamental requirement of a meeting of the minds is inherent in such agreements, as it is in all contracts. "Without a contract there can be no security interest." *In re Metzler* (N.D.Ala.1975), 405 F.Supp. 622, 625.

Therefore the terms of the underlying contract are not foreclosed to inquiry by the mere appearance of a security agreement. Extrinsic evidence is admissible under the U.C.C. to aid the trier of fact in its task of ascertaining the intent of the parties.

Extrinsic evidence may be of particular relevance to a factfinder where the facts are such as those in the present case. The Rempas contend they signed the security agreement and financing statement in blank. The blank security agreement and financing statement were then returned to PCA to be completed according to the agreement reached between Daniel's mother and PCA. Under the Rempas' version of the facts, PCA failed to complete the security interest as they had agreed. Instead PCA listed as collateral the Rempas' farm equipment and crops, property which the Rempas had previously encumbered with a lien pursuant to another loan with PCA in March of 1976.

If the Rempas signed the security agreement in blank under an agreement that it would be completed to cover only the construction equipment, and PCA acted contrary to this understanding, the ensuing lien over the Rempas' farm equipment and crops was not consensual in nature. Consent, however, is an essential element of a valid secured transaction.

■ Furthermore, a debtor's signature in blank does not obviate this requisite consensual element of a secured transaction. The validity of a security agreement signed in blank by the debtor and subsequently completed by the creditor was considered in *In re Allen* (E.D.Ill.1975), 395 F.Supp. 150. In that case the debtors signed the security agreement before a description of the collateral had been written in. The debtors argued that on this basis alone the security interest was invalid. The court found otherwise.

"The fact that the primary reason for requiring a written memorandum is evidentiary and the fact that in the instant case a description of the collateral was subsequently written in the agreement so that it accurately reflected the intent of both parties, leads this Court to conclude that upon completion of the requirements in Section 9–203 a valid and enforceable security interest was created."

395 F.Supp. at 151. Regardless of the order of completion and signing, the security agreement was valid since it *"accurately reflected the intent of both parties . . . ."* (emphasis added).

In *Means v. United Fidelity Life Insurance Co.* (1977), 550 S.W.2d 302 the debtors signed a security agreement in blank. An employee of the lending bank subsequently completed the agreement. At trial the jury found the debtors had authorized the bank to complete the security agreement in that manner. Accordingly, a valid security interest existed in the property listed in the agreement.

■ We concur in the result reached by these cases. If a security agreement, signed in blank by the debtor, has been completed so that it accurately reflects the intent of the debtor and creditor, then a valid and binding security interest has been

created. Further, a debtor's signature in blank we believe implicitly authorizes the creditor to complete the security agreement, *according to the terms agreed to by the parties.* We do not condone such a practice but we find no reason to invalidate security agreements so completed which conform to the agreement of the parties.[3]

 However, a debtor's act of signing a blank security agreement does not authorize the secured party to complete the document according to his predilections. The secured party is bound, by rules of contract and basic notions of fair dealing, to observe the underlying agreement between the parties. If the secured party fails, either inadvertently or intentionally, to complete the security agreement accordingly, then at least between the parties the debtor should not be liable for consequential losses precipitated by the secured party's deviation from the underlying agreement. Whether the security agreement conforms to the terms of the underlying agreement is a question of fact, the resolution of which is within the sole province of the jury. On this point, the trial court erred in taking the case from the jury when it granted the motion for judgment on the evidence.

Having resolved the above issues in favor of the Rempas, a final question remains. Assuming the Rempas' contentions to be true, how were they damaged by PCA's actions?

By failing to take a security interest in the construction equipment, PCA did not have the recourse available to a secured party with a perfected security interest. *See* IC 26–1–9–501, 507.

IC 26–1–3–606(1)(b) provides:

"The holder discharges any party to the instrument to the extent that without such party's consent the holder

\* \* \* \* \* \*

(b) injustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse."

In *White v. Household Finance Corp.* (1973), 158 Ind.App. 394, 302 N.E.2d 828, we held that the failure to execute a security agreement in collateral constitutes an impairment of the collateral pursuant to IC 26–1–3–606(1)(b). The court stated:

"When a creditor releases or negligently fails to protect security put in his possession by the principal debtor, the surety is released *to the extent of the value of the security* so impaired. *Stewart v. Davis* (1862), 18 Ind. 74; *Sample v. Cochran* (1885), 101 Ind. 154; *Owen County State Bank v. Guard* (1940), 217 Ind. 75, 26 N.E.2d 395. This right to discharge is also available to any party to a promissory note with a right of recourse under IC 1971, 26–1–3–606(1)(b)." (Emphasis added)

302 N.E.2d at 833.

The Arkansas Court of Appeals recently addressed the problem of impaired collateral in *Van Balen v. Peoples Bank and Trust Co.* (1982), 3 Ark.App. 243, 626 S.W.2d 205. Reviewing the cases decided under the U.C.C. the court concluded that:

(a) the amount of the impairment of the collateral is the limit of the right of the parties to be discharged; and

(b) the burden of proof is upon the party seeking discharge to establish *both* the failure to properly protect the security and the damage that accrued as a result of that failure.

 Thus, where the party asserting the impairment establishes that the creditor did not perfect its lien but fails to establish the extent to which that failure resulted in loss, the party has failed to establish its affirmative defense of *pro tanto* release.[4] *Van Balen,* 626 S.W.2d at 210.

---

**3.** For the contrary view, *see In re Hein* (1976), 20 U.C.C. 745 (Bktcy.W.D.Wis.).

**4.** We recognize that some jurisdictions recognize an exception to the *pro tanto* rule and permit total discharge where the facts disclose

that there was actual prejudice to the surety but the impairment of the collateral in question cannot be measured in monetary terms. *See, e.g., Langeveld v. L.R.Z.H. Corporation* (1977), 74 N.J. 45, 376 A.2d 931. We do not address this exception since it is not specifically urged

■ In the case before us Rempas introduced three handwritten lists of chattels into evidence. The lists do not contain manufacturer's names or serial numbers. They do not contain any clear indication of who owned the property, when or how it was acquired or any indication that any of the items were purchased with the proceeds of the loan to Daniel. Furthermore, the record does not reveal the value of the equipment at the time the loan became in default; the time when PCA should have been entitled to take possession of the collateral. By failing to offer proof of damages incurred because of the impairment of the collateral, the Rempas failed to establish a necessary element of their defense. Any reduction by the jury in the amount owed by Rempas would necessarily have been the result of speculation and conjecture. Thus, the trial court correctly granted judgment on the evidence as to the amount due.

■ The Rempas assert two other errors. They now claim that their counterclaim was sufficient to present a fraud theory to the jury. It is sufficient answer to this contention that such a claim in Indiana must be premised upon a false representation of existing fact upon which claimant relied to his damage. Promises to do an act in the future are insufficient. *Sachs v. Blewett* (1934), 206 Ind. 151, 185 N.E. 856, *reh. den.* 188 N.E. 674; *Middelkamp v. Hanewich* (1970), 147 Ind.App. 561, 263 N.E.2d 189. Assuming the officers of PCA did state that they would take a security interest in the construction equipment, that representation would not ground an action for fraud.

They also assert the court erred in refusing to admit into evidence a letter written by Daniel Rempa to counsel for PCA. The letter was properly rejected. In it Daniel discussed his attempts to repay the loan and expressed his feeling that PCA should have acquired a lien on the construction equipment. The letter did not assert

by the parties and appears inapplicable to the equipment which was supposed to collateralize

that PCA had agreed to take a security interest and was otherwise properly excluded. Moreover, in view of the result we reach the exclusion was harmless in any event.

The court's error in taking from the jury the question of whether PCA should have taken a security interest in the construction equipment is mooted by the court's alternative correct finding that Rempas failed to establish any damages from impairment of the collateral.

The court's error in taking from the jury the question of validity of the security interest granted in the senior Rempas' farming equipment is rendered harmless by the court's final judgment which neither found nor foreclosed any security interest in the property of the senior Rempas.

The court's money judgment against the Rempas was correct.

Affirmed.

HOFFMAN, P.J., concurs.

STATON, J., concurs and files separate opinion.

STATON, Judge, concurring.

I concur. The right of the Rempas to be discharged from their obligation on the note is limited to the loss suffered by them as a result of PCA's failure to properly perfect a security interest in the construction equipment. In order to establish this loss, the Rempas would have to present evidence which would show the amount of money that could have been realized from the sale of the construction equipment by PCA if it had properly perfected its security interest. The Rempas have failed to make this showing; they have failed to establish their defense of *pro tanto* release; therefore, the judgment of the trial court should be affirmed.