The plaintiffs alleged that the defendants were guilty of fraud in connection with a lease of property in Gadsden on which the plaintiffs had intended to operate a bar.
The plaintiffs claim that, during lease negotiations, the defendants fraudulently promised that the defendants could acquire for the plaintiffs a lease on property adjacent to the leased premises; that adjacent property was needed in order for the plaintiffs to meet zoning requirements of the City of Gadsden for the operation of a bar. More specifically, the plaintiffs alleged that the failure of the defendants to acquire the adjacent property on their behalf caused the City to deny their application for a lounge retail liquor license and that they had relied upon the defendants' promise to their detriment. They asked for compensatory and punitive damages.
The trial court, based upon the pleadings and the evidence submitted in support of the defendants' motion for summary judgment, entered a summary judgment in favor of the defendants. The plaintiffs appealed. This Court, pursuant to Ala. Code 1975, 12-2-7(6), transferred the appeal to the Court of Civil Appeals. That Court, with one Judge dissenting, reversed and remanded, writing in its opinion:
 "When the plaintiffs were presented the lease, they asked why the adjacent property was not included, and one of the defendants stated that he 'would have gotten it three months ago, but was just told that morning that they [the plaintiffs] needed it.' The defendants further stated that 'the owner was good for his word'; 'we'll be your witnesses'; and 'don't worry about *Page 464 
it, because we'll have the property by the end of the week.' The plaintiffs stated that they relied upon these representations and that they would not have otherwise signed the lease agreement. Based on the plaintiffs' statements and the conflicting evidence regarding the defendants' representations, we conclude that the plaintiffs presented substantial evidence creating genuine issues of material fact regarding whether the defendants intended to commit fraud and fraud in the inducement; therefore, the summary judgment was inappropriate."
Green v. Lumpkin, 702 So.2d 459, 460-461 (Ala.Civ.App. 1996). We granted the defendants' petition for certiorari review to consider the holding of the Court of Civil Appeals, especially in view of the fact that the lease contained the following clause: "Lessor has made no representations or promises with respect to said premises except as herein expressly set forth; and lessee agrees that he has examined the premises as fully as desired and is satisfied with the condition thereof as of the commencement of the term of this Lease." (C.R. 30.)
We have reviewed the record that was before the trial court and before the Court of Civil Appeals, and we conclude that the trial court properly entered the summary judgment for the defendants. Therefore, we reverse the judgment of the Court of Civil Appeals and remand the cause for an order or proceedings consistent with this opinion.
The basic facts necessary for a resolution of this case are not disputed. Jodi L. Green and Terri L. Cranford, after negotiating,[1] entered into a lease agreement on March 4, 1993, with Fred Sington, the owner of the building and lot located at 825 So. 4th Street in Gadsden. That lot accommodated 14 parking spaces.
The plaintiffs applied for a license to operate a bar on the leased premises, but on April 27, 1993, the Gadsden City Council denied their application, with the following resolution:
 "Whereas, Jodi Lynn Green and Terri Lynn Cranford, doing business as Club 22, have applied for a lounge retail liquor license for 825 So. 4 th Street; and
 "Whereas, Police Chief John Morris has recommended disapproval because of the conviction of applicant Terri Lynn Cranford of third degree larceny in February 1988 in Rainbow City Municipal Court; and
 "Whereas, Building Official Brian Harbison has recommended disapproval because the location provides only 14 off-street parking spaces when Section VI.A.4 of Ordinance No. 0-02-82 (the zoning ordinance) requires 1 space per 50 square feet of gross floor area or 180 parking spaces;
 "Now, therefore, BE IT RESOLVED BY THE CITY COUNCIL OF GADSDEN, that the City of Gadsden disapproves and denies the issuance of such license for the reasons stated above."[2]
(C.R. 90.)
During the interim between the signing of the lease and the failure of the defendants to obtain the adjacent property, which was owned by another party, the plaintiffs performed a partial renovation of the building that was located on the leased premises.
On May 12, 1994, the plaintiffs filed this action against Greg Lumpkin and M.B. Hagedorn, the real estate agents who had negotiated the lease agreement, and their employer, Ina Black Realty. Their complaint alleged that the defendants had fraudulently promised during the negotiations for the lease that the defendants would get the owner of the adjacent property[3] to lease the *Page 465 
plaintiffs that additional property, thereby allowing them to satisfy the zoning requirements of the city. They alleged that but for this promise by the defendants they would not have signed the lease agreement on March 4, 1993.
The plaintiffs claim that the defendants initially represented to them that the lot adjacent to the leased property accompanied the leased building and could be used for parking and that it was owned by Fred Sington, but that, when it came time to sign the lease, defendant Hagedorn informed them that the adjacent property did not go with the property and, further, that Fred Sington did not own the adjacent property.
The plaintiffs maintain that at the signing they informed Hagedorn that under the zoning regulations they needed more than the 14 parking spaces in order to meet the requirements of the Gadsden zoning ordinance, and that Hagedorn then told them that he could get the adjacent property owner to lease that property to them within a week.
In reversing the judgment of the Court of Civil Appeals in this case, we have applied the principle that "[i]n reviewing the disposition of a motion for summary judgment, we utilize the same standard as . . . the trial court in determining whether the evidence before [it] made out a genuine issue of material fact" and whether the movant was entitled to a judgment as a matter of law. Bussey v. John Deere Co.,531 So.2d 860, 862 (Ala. 1988) (citing Chiniche v. Smith,374 So.2d 872 (Ala. 1979)); see Rule 56(c), Ala. R. Civ. P. The movant has the burden of "showing material facts, which, if uncontested, entitle the movant to [a] judgment as a matter of law." Bernerv. Caldwell, 543 So.2d 686, 688 (Ala. 1989); Woodham v.Nationwide Life Ins. Co., 349 So.2d 1110, 1111 (Ala. 1977). Once the movant has made this showing, the opposing party then has the burden of presenting evidence creating a genuine issue of material fact. Danford v. Arnold, 582 So.2d 545, 546
(Ala. 1991); Bass v. SouthTrust Bank of Baldwin County,538 So.2d 794, 797-98 (Ala. 1989).
This action was filed after June 11, 1987; therefore, the nonmovant must meet the burden of establishing the existence of a genuine issue of material fact by presenting substantial evidence. Ala. Code 1975, § 12-21-12; Bass v. SouthTrust Bank ofBaldwin County, supra. "Substantial evidence" is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. FoundersLife Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989).
Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413
(Ala. 1990); Harrell v. Reynolds Metals Co., 495 So.2d 1381,1383 (Ala. 1986); Wilson v. Brown, 496 So.2d 756, 758
(Ala. 1986).
The gravamen of the plaintiffs' claim is that the defendants are guilty of promissory fraud, specifically, that the defendants promised to acquire the adjacent property for parking, and that they did so as a condition precedent to the plaintiffs' signing the lease, and that their promise constituted actionable fraud.
To recover in a fraud action, the plaintiff must establish certain elements. This Court has written:
 "The cause of action for fraud and misrepresentation is granted by Code 1975, § 6-5-100, et seq. In construing the cause of action created by § 6-5-100, the courts have required the following as the critical elements of an action for fraud:
 " '(a) [A] false representation [usually] concerning an existing material fact, . . .;
 " '(b) representation which (1) the defendant knew was false when made, or (2) was made recklessly and without regard to its truth or falsity, or (3) was made by telling plaintiff that defendant had knowledge that the representation was true while not having such knowledge, Hockensmith v. Winton, 11 Ala. App. 670, 66 So. 954 (1914);
 " '(c) reliance by the plaintiff on the representation and that he was deceived *Page 466 
by it, Bynum v. Rucker, 235 Ala. 353, 179 So. 241
(1938);
 " '(d) reliance which was justified under the circumstances, Fidelity Cas. Co. v. J.D. Pittman Tractor Co., 244 Ala. 354, 13 So.2d 669
(1943);
 " '(e) damage to the plaintiff proximately resulting from his reliance. Smith v. Smith, 266 Ala. 118, 94 So.2d 863 (1957).'
 "First Virginia Bankshares v. Benson, 559 F.2d 1307, 1313 (5th Cir. 1977), rehearing denied, 564 F.2d 416 (5th Cir. 1977), cert. denied, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978)."
Army Aviation Ctr. Fed. Credit Union v. Poston, 460 So.2d 139,142-43 (Ala. 1984). See also, Cato v. Lowder Realty Co.,630 So.2d 378, 381 (Ala. 1993). This Court has further held:
 "An additional burden is added to the party alleging misrepresentation in cases which involve a future act or event.
 " 'In order for promises or opinions to constitute fraudulent misrepresentations, there must have been at the time the representations were made an intention not to do the act promised, and such promise or opinion must have been given with intent to deceive. Birmingham Broadcasting Co. v. Bell, 259 Ala. 656, 68 So.2d 314 (1953). A promise, to constitute fraud, must be made with the intent not to perform it. Schwab v. Carter, 226 Ala. 173, 145 So. 450 (1933).
 " 'While a plaintiff may meet, by circumstantial evidence, this burden of proving a present intent not to perform a future act as promised, the circumstances shown by the evidence of record must be such that the jury, as reasonable persons, may fairly and reasonably infer the ultimate fact sought to be proved.' "
Army Aviation Ctr. Fed. Credit Union, 460 So.2d at 143, quotingClanton v. Bains Oil Co., 417 So.2d 149, 151 (Ala. 1982) (emphasis added). See also, Valley Properties, Inc. v. Strahan,565 So.2d 571, 576 (Ala. 1990).
Recently, Spring Hill Lighting Supply Co. v. Square D Co.,662 So.2d 1141, 1149 (Ala. 1995), this Court reiterated this principle, stating:
 "In promissory fraud, the material existing fact that is misrepresented is the defendant's state of mind, when the defendant represents that he intends to perform some act although he does not in fact intend to perform it. Walker v. Woodall, 288 Ala. 510, 513, 262 So.2d 756, 759 (1972).
 " 'Neither [Ala. Code 1975, § 6-5-101] nor [Ala. Code 1975, § 6-5-103] [speaks] of future occurrences. They both refer to "a material fact," which is then existing. As to promises (or opinions) there must have been at the time an intention not to do the act promised (an existing status) and [there must be a showing] that it was made with the intent to deceive.'
 "Birmingham Broadcasting Co. v. Bell, 259 Ala. 656, 664, 68 So.2d 314, 321 (1953)."
(Emphasis added.)
The defendants claim that this case is factually similar toBallew v. Charter Realty ERA, 603 So.2d 877 (Ala. 1992), where the plaintiffs alleged that a real estate agent misrepresented to them "that there was no problem with their loan being approved by Altus [Bank] and that she was 'sure that it was going through.' " 603 So.2d at 881. We agree. In Ballew, this Court, citing Harrell v. Dodson, 398 So.2d 272 (Ala. 1981), held that a mere statement of opinion by a real estate agent "cannot be used to impose liability on the agent as if it were a statement of fact." 603 So.2d at 882.[4] *Page 467 
Although it could be argued that the representations made by the agents in this case were more than a mere statement of opinion, there is no evidence in the record that either Hagedorn or Lumpkin, at the time of the signing of the lease, intentionally misrepresented to the plaintiffs that they could obtain the adjacent property or that they, in fact, knew at the time of the execution of the lease agreement that the owner of the adjacent property would not lease it. On the contrary, the evidence in the record shows that Lumpkin repeatedly tried to get Ms. Glenn, the owner of the adjacent property, to lease the property to the plaintiffs.[5]
The defendants rely heavily on this Court's opinion inCallis v. Colonial Properties, Inc., 597 So.2d 660 (Ala. 1991). The Court of Civil Appeals distinguished that case from this case on the grounds 1) that the lease contract in Callis
contained a clause stating that "[n]o representation, inducement, understanding or anything of any nature whatsoever made, stated or represented on Landlord's behalf, either orally or in writing (except this Lease), has induced Tenant to enter into this Lease," 597 So.2d at 661, and 2) that "although the plaintiffs [in this present case] had signed the lease with knowledge that a separate lease was needed for the adjacent property, there was no comparable provision regarding inducement, additional statements, or promises made." Green v.Lumpkin, 702 So.2d at 461.
The lease agreement in this case does contain a similar provision:
 "Lessor has made no representations or promises with respect to said premises except as herein expressly set forth; and Lessee agrees that he has examined the premises as fully as desired and is satisfied with the condition thereof as of the commencement of the term of this lease."
(C.R. 30.) In Callis, we reasoned:
 "The language in the lease signed by Callis states that only the representations in the lease itself induced her to enter into the agreement. Callis was presented with a copy of the lease agreement, and she even requested several changes in the lease, none of which had to do with the provision in question. The trial court did not err in entering the summary judgment as to her fraud and misrepresentation claim."
597 So.2d at 661 (emphasis added).
Even if we did not apply the parol evidence rule and the "merger doctrine" in this case (as we did not apply them inEnvironmental Systems, Inc. v. Rexham Corp., 624 So.2d 1379
(Ala. 1993)), the summary judgment was nonetheless appropriate here. We are aware that in Environmental Systems this Court did hold that the parol evidence rule and the merger doctrine do not *Page 468 
apply to fraud actions, but in doing so the Court distinguished that holding from the holding the Court had made inCallis, stating:
 "Rexham argues that Callis v. Colonial Properties, Inc., 597 So.2d 660 (Ala. 1991), in which this Court affirmed a summary judgment in the defendant's favor against the plaintiff's fraudulent inducement claim, stands for the proposition that a merger clause bars extrinsic evidence of fraud inducing one of the parties to enter a contract. If this Court adopts the construction of Callis that Rexham urges, then Callis would overrule dozens of Alabama cases and a century and a half of case law on the inapplicability of the parol evidence rule to fraud actions. It is unfathomable that this Court would overrule such a longstanding precedent without even mentioning the parol evidence rule or referring to any of the earlier cases on point; therefore, we construe Callis as consistent with our prior cases. Accordingly, we construe the opinion in Callis to have reached this conclusion based on a theory of promissory fraud, rather than based on an application of the parol evidence rule or a merger clause to Callis's fraud claim, as Rexham suggests.
 "The alleged misrepresentation in Callis related to a promise of future performance on the part of the defendant, i.e., that it would not lease space in a shopping mall to 'discount houses.' This Court has held:
 " 'The only basis upon which one may recover for fraud, where the alleged fraud is predicated on a promise to perform or to abstain from an act in the future, is when the evidence shows that, at the time the promise of future action or abstention was made, the promisor had no intention of carrying out that promise, but rather had a present intent to deceive.'
 "Fraser v. Reynolds, 588 So.2d 442, 446, n. 3 (Ala. 1990) (emphasis in original). Callis's complaint alleged that Colonial Properties promised to abstain from leasing to discount stores in the future; therefore, this Court construed her claim to be one for promissory fraud. Because she did not present substantial evidence creating a genuine issue of material fact as to whether the defendant, when it made the alleged representations, intended to deceive her and intended not to abstain from leasing to discount houses, that failure of proof was an adequate basis for the Court to affirm the summary judgment. The holding in Callis does not, therefore, overrule or conflict with the well-established principle making the parol evidence rule and the merger doctrine inapplicable to fraud actions."
624 So.2d at 1383-84 (first emphasis added) (footnote omitted). In Environmental Systems, this Court further explained in footnote 6:
 "Although neither the main opinion nor the special writings in Callis made specific reference to the promissory fraud theory, a review of the record in Callis reveals that, in its motion for summary judgment, Colonial Properties, Inc., argued that Callis alleged a claim of promissory fraud but that she failed to present substantial evidence of the additional elements of promissory fraud: an intent, at the time of the alleged misrepresentation, not to do the act promised and an intent to deceive. P S Business, Inc. v. South Central Bell Tel. Co., 466 So.2d 928 (Ala. 1985). Although it is not clear whether the trial court accepted this argument in granting Colonial Properties' motion for summary judgment, this Court considered that argument to be an adequate basis for affirming the trial court's summary judgment. McMillan, Ltd. v. Warrior Drilling Eng'g Co., 512 So.2d 14, 26 (Ala. 1986) (noting that this Court will affirm a summary judgment if it was properly granted, notwithstanding the fact that the trial court gave the wrong reasons for granting it). . . ."
624 So.2d at 1384 (emphasis added). We conclude that the same legal reasoning must be applied in the present case and the same conclusion reached. The plaintiffs here alleged fraud in the inducement. If they had presented substantial evidence indicating that the defendants committed fraud in the inducement, then we would hold, as the *Page 469 
Court of Civil Appeals held, that the summary judgment was improper. We have reviewed the record in a light most favorable to the plaintiffs, as we are required to do, and we conclude that the trial court properly entered the summary judgment in favor of the defendants.
The judgment of the Court of Civil Appeals is reversed, and the cause is remanded for an order or proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOOPER, C.J., and HOUSTON, COOK, and SEE, JJ., concur.
BUTTS, J., concurs in the result.
[1] During the negotiations, the parties made numerous changes to the lease agreement before they executed it. (C.R. 25-27.)
[2] Gadsden Mayor Steve Means, in a letter dated May 27, 1993, and addressed to the plaintiffs, stated:
 "The listing of the conviction first on the resolution was no indication that it was the main, primary or motivating reason for the Council action. . . . It would be speculative to say whether the Council would have denied the license on the sole basis of the conviction."
(C.R. 91.) (Emphasis added.)
[3] It is undisputed that the plaintiffs were told when they signed the lease that the owner of the adjacent property had not been contacted concerning a lease of the adjacent property and that the owner was not Fred Sington.
[4] In the present case, Terri Cranford testified at her deposition, in part, as follows:
 "A. That's when Mr. Hagedorn — that's the day we signed the lease when we was fixing — you know, we was going over the lease, and I asked him, 'Well, did you put this in there about the parking?' and Mr. Hagedorn was, like, parking — and he looked — 'Oh, Greg just told me that this morning. If I had known that, I could have had that for you about three months ago,' or something. He said something like that. And he said — Mr. Hagedorn said 'I'll get right on that,' and Greg said, 'Yeah, don't worry, you know, we'll have that for you at the end of the week.' That was what Greg said concerning that."
(C.R. 58.) (Emphasis added.)
 "Q. What did Greg say when you said 'Where is it [the adjacent property] in the lease?'?
 "A. He said 'He's got to' — that's when we found out that the parking — he said 'He's got to call Ms. Glenn,' Ms. Glenn, I think that was her name, I might be mistaken about her name, and that's — you know, I was like, well, Ms. Glenn, and he said, 'Yeah, Ms. Glenn and her son own this [the adjacent property].' So that was a surprise.
 "Q. That was the first time that you found out that Ms. Glenn owned the property?
 "A. But he said, you know, 'Don't worry,' you know, 'parking is in the bag, don't worry about it, we'll have it for you by the end of the week.' "
(C.R. 40-41.)
 "Q. So you understood that there was going to be a separate second lease having to do only with the parking lot, is that correct?
 "A. I don't know if they were going to add it back into that or put it separate or what. All I know is they was going to have me the parking within a week. That's what they promised.
 "Q. Okay. So you knew it wasn't in the lease that you signed, but you expected it to be in some other written document —
"A. Right."
(C.R. 46-47.)
[5] Jodi Lynn Green testified at her deposition, in part, as follows:
 "Q. You said that Ms. Glenn got so upset with Mr. Lumpkin calling her about parking that she was to the point of cussing him; is that correct?
"A. Cursing, yes, ma'am.
"Q. When was this?
"A. The whole month of March.
 "Q. So, he kept calling her and tried to pester her into doing it; is that correct?
"A. To the best of my knowledge, yes.
 "Q. Do you think he was really trying to get that parking for you on the adjacent lot?
"A. Oh, yes."
(C.R. 89.)